# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on November 15, 2007

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NUMBER:** |
| | : | |
| | : | **GRAND JURY ORIGINAL** |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **NAIBEYE KOUMBAIRIA, AKA BEE,** | : | |
| **AKA NATBEYE KOUMBAIRIA, AKA** | : | **18 U.S.C. § 1344 (Bank Fraud)** |
| **BRIAN COUILABLY,** | : | **18 U.S.C. § 1343 (Wire Fraud)** |
| **AKA NAIBEYE KOOMBAIRIA,** | : | **18 U.S.C. § 1349 (Conspiracy)** |
| **AKA BRI COUILBALY,** | : | **18 U.S.C. § 2 (Causing an Act to be Done;** |
| **AKA NAIBEYE EMMANUEL** | : | **Aiding and Abetting)** |
| **KOUMBAIRIA;** | : | **18 U.S.C. § 513 (Uttering the Securities of** |
| **WILLIAM K. GLAY;** | : | **a Private Entity)** |
| **EDWIN T. TANTOH, AKA** | : | **18 U.S.C. § 982(a)(2) & 28 U.S.C. § 2461(c)** |
| **HOLYFIELD;** | : | **(Criminal Forfeiture)** |
| **MELVIN C. JOHNSON, AKA ERIC** | : | |
| **SULLIVAN, AKA MALIK JOHNSON;** | : | |
| **CARL I. COLEMAN; AND** | : | |
| **KENYA N. YOKLEY** | : | |
| **AKA KENYA T. YOKLEY** | : | |
| | : | |
| **Defendants.** | : | |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE – CONSPIRACY

_____At all times material to this Indictment:

### INTRODUCTION

### The Defendants

_____1. Defendant **NAIBEYE KOUMBAIRIA**, **AKA BEE, AKA NATBEYE KOUMBAIRIA,**

**AKA NAIBEYE KOOMBAIRIA, AKA BRIAN COUILABLY, AKA BRI COUILBALY, AKA**

**NAIBEYE EMMANUEL KOUMBAIRIA** (hereinafter "**KOUMBAIRIA**") was a resident of the District of Columbia.

2. Defendant **WILLIAM GLAY** (hereinafter "**GLAY**") was a resident of Montgomery County in the state of Maryland.

3. Defendant **MELVIN C. JOHNSON, AKA ERIC SULLIVAN, AKA MALIK JOHNSON (hereinafter "JOHNSON")** was a resident of Prince George's County in the state of Maryland.

4. Defendant **EDWIN TANTOH AKA HOLYFIELD** (hereinafter "**TANTOH**") was a resident of Montgomery County in the state of Maryland.

5. Defendant **CARL I. COLEMAN** (hereinafter "**COLEMAN**") was a resident of Montgomery County in the state of Maryland.

6. Defendant **KENYA YOKLEY** (hereinafter "**YOKLEY**") was a resident of Prince George's County in the state of Maryland.

<u>The Banks</u>

7. **AM South Bank** was a financial institution whose principal place of business was in Memphis, Tennessee, whose assets were insured by the Federal Deposit Insurance Corporation.

8. **Bank of America** was a financial institution whose principal place of business was in Charlotte, North Carolina, whose assets were insured by the Federal Deposit Insurance Corporation.

9. **BB&T Bank** was a financial institution whose principal place of business was in Wilson, North Carolina, whose assets were insured by the Federal Deposit Insurance Corporation.

10. **CitiBank** was a financial institution whose principal place of business was in San Antonio, Texas, whose assets were insured by the Federal Deposit Insurance Corporation.

11. **Manufacturers and Traders Trust Company Bank** (hereinafter M&T Bank) was a

financial institution whose principal place of business was in Buffalo, New York, whose assets were insured by the Federal Deposit Insurance Corporation.

12. **Provident Bank** was a financial institution whose principal place of business was in Baltimore, Maryland, and whose assets were insured by the Federal Deposit Insurance Corporation.

13. **SunTrust Bank** was a financial institution whose principal place of business was in Atlanta, Georgia, and whose assets were insured by the Federal Deposit Insurance Corporation.

14. **United Bank** was a financial institution whose principal place of business was in Vienna, Virginia, and whose assets were insured by the Federal Deposit Insurance Corporation.

15. **Wachovia Bank** was a financial institution whose principal place of business was in Charlotte, North Carolina, and whose assets were insured by the Federal Deposit Insurance Corporation.

<u>Other Entities</u>

16. **Certegy** is a subsidiary of Fidelity National Information Services, a provider of financial services including core financial institution processing such as check authorization. **Certegy** utilizes artificial intelligence modeling, neural networks, and other state-of-the-art technology to deliver services that reduce the risk of check fraud, among other things.  In exchange for a percentage of each check cashed whose authenticity is verified through **Certegy**, **Certegy** enters into agreements with various retail establishments whereby it becomes the guarantor of checks cashed using its services.  **Certegy's** principal place of business is at 11601 Roosevelt Boulevard, St. Peterburg, Florida, where its main computer frame is located.  In order to minimize the risk of accepting as payment a personal check by retail establishments, **Certegy** established the following procedures:

a.  When a customer presents a personal check to the retail establishment with which **Certegy** had an agreement, the cashier must obtain a driver's license or other similar mode of identification from the customer and transmit that number by means of a computer to **Certegy**.

b. **Certegy** maintains a list of driver's licenses and other identification numbers that have been "flagged" due to previous submission of valueless checks.  If the number submitted by the retail establishment's cashier is registered with **Certegy** as being "flagged," **Certegy** communicates by computer with the retail establishment and advises that the check should not be accepted.

c.  Similarly, if the number has not been "flagged," **Certegy** communicates by computer with the retail establishment to notify the cashier that the transaction has been approved by Certegy and that the check can be accepted.

d.  In those instances where **Certegy** has agreed to be the guarantor, **Certegy** is liable for paying the cost of the check to the retail establishment if it turns out that there are insufficient funds or that the check was counterfeit.

17.  **Advantage Technical Services** (hereinafter "**Advantage**") is a small service, sales, and business supply business operating in Silver Spring, Maryland.  The business is currently in its twentieth year of operation.  One of the two co-owners of **Advantage** is Louis Buckner.

a.  Among many other business supplies, **Advantage** sold re-usable cartridges containing the special ink used to print the unique characters found at the bottom of checks (comprising usually the bank routing number, the account number on which the check is drawn, and the check number).  This magnetic ink character recognition toner, more commonly known as

"MICR ink," causes the characters printed in this ink or toner to become magnetized, emitting a magnetic signal that identifies each unique character.

b. Developed in the mid-1950s, MICR ink alleviates the burden associated with the manual processing of great volumes of checks and allows checks to be processed on special reader/sorter machines which magnetize the "MICR line," read the magnetic signals emitted, and purport to determine the authenticity of the check.

## THE CONSPIRACY

18. From in or about 1999, and continuing thereafter through at least in or about March 2007, in the District of Columbia, the state of Maryland, the Commonwealth of Virginia and elsewhere, **KOUMBAIRIA**, **GLAY, TANTOH, JOHNSON, COLEMAN, YOKLEY,** and others both known and unknown to the Grand Jury, did unlawfully and knowingly combine, conspire, confederate and agree together and with each other to commit offenses against the United States, that are:

A.   bank fraud, accomplished by their engaging in a scheme to defraud and obtain money and property from financial institutions by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1344 and 2; and

B.   wire fraud, accomplished by their engaging in a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises and for the purpose of executing, and attempting to execute the scheme to defraud, willfully causing to be transmitted wire communications in interstate commerce, in violation of Title 18, United States Code, Sections 1343 and 2.

## GOAL OF THE CONSPIRACY

19.  The goal of the conspiracy was for the conspirators**, GLAY, TANTOH, JOHNSON, COLEMAN, YOKLEY,** and others both known and unknown to the Grand Jury, to unlawfully enrich themselves by fraudulently obtaining in excess of $1.6 million in monies from the following financial institutions: AM South Bank, Bank of America, BB&T Bank, CitiBank, M&T Bank, Provident Bank, SunTrust Bank, United Bank, Wachovia Bank, Certegy; certain liquor stores; and other retail establishments, by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS OF THE CONSPIRACY

20.  In order to achieve the goal of the conspiracy, conspirators**, KOUMBAIRIA, GLAY, TANTOH, JOHNSON, COLEMAN, YOKLEY** and others both known and unknown to the Grand Jury, used the following manner and means, among others:

A.   Members of the conspiracy were organized on five levels: 1) the ring leader, who controlled the conspiracy; 2) the printers; 3) the recruiters;  4) corrupt bank and business insiders; and 5) the passers.  Sometimes the lines between the different levels were not clearly delineated and persons on different levels would play more than one role.

1.   The ring leader was conspirator **KOUMBAIRIA**, who organized the members of the conspiracy, obtained copies of genuine checks from various sources, printed counterfeit checks, taught others how to print counterfeit checks, gave out daily assignments in furtherance of the conspiracy and divided the daily proceeds among the conspirators.

2.   The printers, including conspirators **JOHNSON** and **GLAY,** as well as other, unindicted conspirators, were responsible for printing the counterfeit checks.

6

3. The recruiters, including **TANTOH**, unindicted conspirators A and E, and others both known and unknown to the Grand Jury, were responsible for recruiting the passers.

4. The bank insiders, including unindicted conspirators D, F and I, were responsible for getting account information or providing the conspirators with copies of checks, which **GLAY** and **JOHNSON** would use to make the counterfeit checks.

5. The passers, including **COLEMAN** and **YOKLEY,** and numerous other unindicted conspirators, both known and unknown to the Grand Jury, were responsible for cashing counterfeit checks at banks, check cashing stores, and other retail establishments.

B. During the course of the conspiracy, the conspirators obtained account information from unwitting account holders at various banks in the following ways:

1. Conspirators **KOUMBAIRIA, GLAY,** and other unindicted conspirators, including unindicted conspirator A, recruited insiders or corrupt bank employees from various banks, including Provident Bank and SunTrust Bank, and caused the insiders to provide the conspirators with copies of legitimate checks, checking account numbers, and/or other checking account information such as routing numbers, account signatures, and balances of the accounts of various companies, businesses, organizations and individuals; or

2. By recruiting bank insiders, the conspirators were provided with the originals or copies of checks from various businesses to which the insiders had access because of their employment positions.

3. During the course of the conspiracy, **GLAY** would recruit individuals, such as **COLEMAN** and unindicted conspirator G, to allow him to open bank accounts in their names with the assistance of bank insider unindicted conspirator F. **GLAY** would then illegally obtain money

7

from these accounts or use account information obtained from unindicted conspirator F to make counterfeit checks as follows:

a. **GLAY** would have **COLEMAN** and other unindicted conspirators deposit counterfeit checks payable to **COLEMAN** into his account at Provident Bank or into the account of unindicted conspirator G. Thereafter, **GLAY** would withdraw the money from the accounts of **COLEMAN** and unindicted conspirator G, giving them both a portion of the proceeds; or

b. Conspirator **GLAY** would also deposit counterfeit checks into unindicted conspirator G's account and then make checks payable to **COLEMAN**, drawn on the account of unindicted conspirator G, in order to launder unindicted conspirator G's counterfeit proceeds. Thereafter, **GLAY** would withdraw the money from **COLEMAN's** account, giving him a portion of the proceeds.

c. In addition, unindicted conspirator F would provide conspirator **GLAY** with account information from several Provident Bank customers, including signature cards and copies of checks of Provident account holders, which conspirators **KOUMBAIRIA** and **GLAY** used to make counterfeit checks.

C. In order to make the counterfeit checks and to achieve the goals of the conspiracy, the conspirators would use Magnetic Ink Character Recognition more commonly known as "MICR" ink to print the characters found at the bottom of checks.

D. In addition to the use of the MICR ink, it was part of the conspiracy that the conspirators would use computers, check stock, scanners, and printers to make counterfeit checks drawn on the accounts of the individuals, corporations, and businesses from which such account information was obtained, as noted above.

8

E.  It was part of the conspiracy that the conspirators would purchase their MICR ink from Advantage Technical Services, where unindicted conspirator E was once employed, as it was less expensive than that sold at other office supply stores because the cartridges in which the ink was stored were recycled.

F.  It was a part of the conspiracy that the conspirators obtained money from compromised accounts or the accounts on which the counterfeit checks were drawn in one of the following manners:

1.  The recruiter conspirators would recruit by various means persons perceived by them to be addicted to drugs or otherwise in need of cash. They would entice them to join the conspiracy by offering a way to make cash quickly.  The recruiter conspirator would explain to them that even if they were caught passing the counterfeit check that it would be unlikely that they would ever be incarcerated.

2.  The recruiters would next obtain the names and addresses of the passers and, at times, forms of identification such as their driver's licenses.  This information was, in turn, provided to the printers who printed the counterfeit checks made payable to the passers.

3.  The recruiters would obtain the counterfeit checks in the names of the passers from the printers and then drive the passers around to various banks, check cashing establishments, and/or retail establishments, where the recruiters would direct the passers to cash the checks while the recruiter waited outside.

4.  When the passers left the establishments, the recruiters would be waiting outside to retrieve the money.  The recruiter would in turn give the passers a small portion of the cash proceeds.

9

5.  The conspirators would also fraudulently retrieve money from bank accounts by opening accounts in the names of lower level conspirators or by using an existing account of a lower level conspirator into which they would deposit counterfeit checks in large dollar amounts.

6.  The conspirators would then have checks made out to passers who would in turn cash checks on the accounts against the counterfeit check before the fraudulent nature of the check was discovered.

7.  Again, when the passers left the bank or check cashing establishments, the recruiter would be waiting outside to retrieve the money.  The recruiter would in turn give the passer a small portion of the cash proceeds.

G.  In order to achieve the goal of the conspiracy, **KOUMBAIRIA, GLAY, TANTOH, JOHNSON,** and other unindicted conspirators would regularly meet at **KOUMBAIRIA's** home located at 5125 8th Street, N.W., Washington, D.C., where they would discuss their daily plans for their illegal enterprise.

1.  At such meetings, the printers would distribute the checks to be cashed for the day. The checks would be made out to the passers whose information had been provided to them by the recruiters the day before.

2.  Passers and the insiders generally would not attend meetings at this location. Rather they would be paid their small share of the fraudulently obtained funds immediately after they had cashed a counterfeit check.

H.  At the end of the day, **KOUMBAIRIA, GLAY, TANTOH, JOHNSON,** and other unindicted conspirators, would again meet at the home of **KOUMBAIRIA,** where they would give the day's proceeds to **KOUMBAIRIA**, who would in turn divide the proceeds among the

conspirators present in his home.  Also at these meetings, the recruiters would give the printers the names of the passers they planned to use the following day.

I.  It was a further part of the conspiracy that, in order to protect the proceeds thereof, **KOUMBAIRIA** possessed a .45 caliber Hi-Point automatic pistol, which he often displayed to conspirators with whom he met in his home.

J.  It was a further part of the conspiracy that in order to carry out their scheme to make money **KOUMBAIRIA**, **GLAY, JOHNSON,** and other unindicted conspirators would make the counterfeit checks with the special magnetized MICR ink, thereby causing information to be transmitted by wire, across interstate lines between Certegy and federally-insured banks, check cashing businesses, and other retail establishments whenever the passers would cash a counterfeit check.

## OVERT ACTS

In furtherance of the above-described conspiracy and in order to carry out the objects thereof, within the District of Columbia and elsewhere, **KOUMBAIRIA**, **GLAY, TANTOH, JOHNSON, COLEMAN, YOKLEY** and others, both known and unknown to the Grand Jury, committed the following overt acts, among others:

### Recruitment of Passers by Coconspirators

21.  Sometime in or about the year of 1999, conspirator **JOHNSON** recruited unindicted conspirator A to become a part of the conspiracy.

22.  Between in or about 1999 and in and about 2003, **JOHNSON,** in turn, introduced unindicted conspirator A to other conspirators, both indicted and unindicted, who began to use conspirator A as a passer.

23.  On or about May 7, 2003, within the District of Columbia, unindicted conspirator A attempted to cash a counterfeit check drawn on the account of the International House of Pancakes at the SunTrust Bank, in the amount of $404.05, using a false identification in the name of a person other than his or her own, by certifying to an employee at Guilford Liquors that this check was true and genuine.

24.  In or about December 2005, **KOUMBAIRIA** recruited unindicted conspirator B to become a part of the conspiracy as a passer.

25.  On or about January 12, 2006, within the District of Columbia, unindicted conspirator A cashed a counterfeit check drawn on the account of Discovery Communications at SunTrust Bank, in the amount of $678.21, by certifying to an employee at Y & Y Liquors that this check was true and genuine.

26. On or about February 13, 2006, within the District of Columbia, unindicted conspirator A cashed a counterfeit check drawn on the account of Howard University at the Bank of America, in the amount of $891.25, by certifying to an employee at Mart Liquor Store that this check was true and genuine.

27.  On or about April 14, 2006, within the District of Columbia, unindicted conspirator A cashed a counterfeit check drawn on the account of Discovery Communications, at SunTrust Bank, in the amount of $697.25, by certifying to an employee at Wheeler Liquors that this check was true and genuine.

28. In or about November 2005, a person who called himself **HOLYFIELD**, later determined to be conspirator **EDWIN T. TANTOH,** met unindicted conspirator C at a bar in the state of Maryland.

29.  After meeting him, eventually **TANTOH** recruited conspirator C to become a member of the conspiracy by causing unindicted conspirator C to agree to allow him to wire $20,000 into unindicted conspirator C's bank account at the Bank of America, in exchange for **TANTOH'S** promise to pay unindicted conspirator C $10,000.

30.  In or about January 2006, unindicted conspirator I gave unindicted conspirator H a genuine check drawn on the account of State Plaza Hotel which unindicted conspirator I had stolen from the State Plaza Hotel.

31. In or about January 2006, unindicted conspirator H gave the stolen State Plaza Hotel check referred to above in paragraph 30 to conspirator **KOUMBAIRIA.**

32. In or about January 2006, in the District of Columbia, conspirator **KOUMBAIRIA** created a counterfeit check drawn on the account of State Plaza Hotel at the Bank of America in the amount of $47,357.14.

33. In or about January 2006, conspirator **KOUMBAIRIA** gave that counterfeit State Plaza Hotel check to conspirator **TANTOH**.

34.  Unbeknownst to unindicted conspirator C, on or about January 23, 2006, **TANTOH** caused to be transferred into unindicted conspirator C's account at the Bank of America, a counterfeit check in the amount of $47,357.14, drawn on the account of State Plaza Hotel.

35.  Conspirator **TANTOH** caused the check referred to in paragraph 34 to be deposited into unindicted conspirator C's account, in the amount of $47,357.14, rather than wire $20,000, as he had initially promised unindicted conspirator C.

36.  In or about January 2006, conspirator **TANTOH** caused unindicted conspirator C to withdraw $18,000 from unindicted conspirator C's account at the Bank of America, in the form of

two cashier's checks for $9,000 each – one of which was made out to conspirator **TANTOH's** girlfriend and the other was made payable to a person known to the Grand Jury, who in turn gave the proceeds to unindicted conspirator C.

37.    Thereafter, **TANTOH** and **KOUMBAIRIA**  caused several different passers to withdraw the rest of the money from the account of unindicted conspirator C.

38. Thereafter, on or about February 17, 2006, **TANTOH,** again unbeknownst to unindicted conspirator C, deposited another check for $47,357.14 into unindicted conspirator C's account at the Bank of America.

### Purchase of Micr Ink

39.    After leaving the employment of Advantage Technical Services in Silver Spring, Maryland, unindicted conspirator E, on several occasions, returned to the establishment to purchase various supplies, including MICR ink cartridges.

40.    In or about 2003, conspirator **JOHNSON** approached one of the owners of Advantage, claiming to be the cousin of unindicted conspirator E,  who used to work at the store, and requested a discount on a MICR ink cartridge.

41.    On several occasions between on or about January 8, 2003, and in or about the summer of 2006, **JOHNSON** returned to Advantage to purchase MICR ink.

42.    Between in or about 2003 and in or about 2006, conspirator **KOUMBAIRIA** and unindicted conspirator A would periodically go to Advantage Technical Services to purchase MICR ink.

14

## Recruitment of Bank Insiders

### Provident Bank

43.  In or about the beginning of 2006, **GLAY** recruited unindicted conspirator F, a bank teller at Provident Bank in Germantown, Maryland, to become a member of the conspiracy.

44.  In or about the beginning of 2006, **GLAY** convinced unindicted conspirator F to give him information on the accounts of various bank customers, including the account numbers, addresses, signatures, and routing numbers, which **KOUMBAIRIA** and others would use to make counterfeit checks.

45.  In or about the summer of 2006, **GLAY**, caused unindicted conspirator F to allow him to open up an account in the name of **COLEMAN** and another unindicted conspirator at the Germantown, Maryland, branch of the Provident Bank.

46.  In or about September 2006, conspirator  **COLEMAN** provided **GLAY** with his driver's license and other information needed to open up the account in his name at the Germantown, Maryland branch of the Provident Bank.

47.  On or about September 30, 2006, with the assistance of unindicted conspirator F, conspirator **GLAY** opened an account in the name of **COLEMAN** at the Germantown, Maryland, branch of the Provident Bank.

48.  On or about September 30, 2006, with the assistance of unindicted conspirator F, conspirator **GLAY** opened a second account in the name of unindicted conspirator G at the Germantown, Maryland, branch of the Provident Bank

49.  On or about September 14, 2006, in Rockville, Maryland, conspirator **COLEMAN**, cashed a counterfeit check drawn on the account of Got-V-Mail at the Bank of America, in the

15

amount of $2,492.00, at the Shady Grove Road branch of Provident Bank against his Provident Bank account.

50. On or about September 14, 2006, in Rockville, Maryland, conspirator **COLEMAN** cashed a counterfeit check drawn on the account of Got-V-Mail at the Bank of America, in the amount of $2,497.67, at the Washington Street branch of Provident Bank, which was cashed against conspirator **COLEMAN's** Provident bank account.

51. On or about December 6, 2006, an unindicted conspirator deposited check number 105, drawn on the account of unindicted conspirator G, at Provident Bank in the amount of $3,500 into the account of **COLEMAN** at Provident Bank.

52. On or about December 7, 2006, an unindicted conspirator deposited check number 107, drawn on the account of unindicted conspirator G, at Provident Bank in the amount of $3,480 into the account of **COLEMAN** at Provident Bank.

<u>SunTrust Bank</u>

53. In or about June 2006, and continuing up to in or about July 2006, **KOUMBAIRIA** met unindicted conspirator D, a bank insider at SunTrust Bank, in and around the District of Columbia, and caused unindicted conspirator D to join the conspiracy, by informing unindicted conspirator D that it could make money with little risk of incarceration by providing conspirator **KOUMBAIRIA** with copies of legitimate checks, checking account numbers, and other checking account information of various bank companies, businesses, and organizations, such as Pioneer Builders, Inc., Focused Management, Inc., and D&D Tire Company, all of which were SunTrust customers.

54. On or about June 6, 2006, a person known to the Grand Jury cashed legitimate check number 6089 drawn on the SunTrust account of Focused Management, Inc. The memo line of the check included the notation "CT Services performed - 5/06/06 - 5/19/06; 64 hours @."

55. At the insistence of **KOUMBAIRIA,** on or about June 6, 2006, unindicted conspirator D accessed the SunTrust account information of Focused Management, Inc. to determine the amount of funds available and to ensure that there was no "red flag" indicating that the banking authorities were aware that the account had been compromised.

56. In or about June 2006, unindicted conspirator D provided a copy of check number 6089 to **KOUMBAIRIA**, who used it to create counterfeit checks.

57. On or about June 7, 2006, a counterfeit check in the amount of $2,496.70, drawn on the account of Focused Management, Inc., was passed at 1571 Alabama Avenue, S.E., Washington, D.C. The memo line on the counterfeit checks had the same notation reflected on the legitimate check that unindicted conspirator D had cashed the day before.

58. On or about June 7, 2006, a counterfeit check in the amount of $2,492.30, drawn on the account of Focused Management, Inc., was passed at 1275 K Street, N.W., Washington, D.C. The memo line on the counterfeit check had the same notation reflected on the legitimate check that unindicted conspirator D had cashed the day before.

59. On or about June 7, 2006, a counterfeit check in the amount of $2,491.00, drawn on the account of Focused Management, Inc., was passed at 1100 Connecticut Avenue, N.W., Washington, D.C. The memo line on the counterfeit check had the same notation reflected on the legitimate check that unindicted conspirator D had cashed the day before.

60.  On or about June 7, 2006, a counterfeit check in the amount of $2,498.00, drawn on the account of Focused Management, Inc., was passed at 1445 New York Avenue, N.W., Washington, D.C.  The memo line on the counterfeit check had the same notation reflected on the legitimate check that unindicted conspirator D had cashed the day before. ___

61.  On or about June 7, 2006, a counterfeit check in the amount of $2,494.00, drawn on the account of Focused Management, Inc., was passed at 2929 M Street, N.W.,  Washington, D.C.  The memo line on the counterfeit check had the same notation reflected on the legitimate check that unindicted conspirator D had cashed the day before.

### Protection of the Proceeds of the Conspiracy

62.  On or about March 6, 2007, coconspirator **KOUMBAIRIA** possessed a .45 caliber Hi-Point automatic pistol in his home in order to protect himself and the proceeds of the conspiracy.

(**Conspiracy, in violation of Title 18 United States Code, Section 1349**)

### COUNT TWO - WIRE FRAUD

1.  Paragraphs one through seventeen and twenty through sixty-two of Count One of this Indictment contain the description of the following scheme and are re-alleged and incorporated by reference as if set out in full.

2.  From in or about June 2006, through in or about July 2006, within the District of Columbia and elsewhere, the defendants **KOUMBAIRIA, GLAY, TANTOH,  JOHNSON** and others both known and unknown to the Grand Jury, devised and intended to devise, and aided and abetted a scheme or artifice to defraud SunTrust and other businesses, corporations, and individuals by making, depositing, and cashing counterfeit checks, and causing the transmission of a wire communication in interstate commerce, consisting of information regarding the accounts upon which

the counterfeit checks were drawn in order to carry out the scheme or artifice, as is more fully described below.

3. The main frame computer terminal for SunTrust Bank is located at 8303 Peachtree Street, Atlanta, Georgia.

4. Each time a check is cashed at any SunTrust Branch within the United States, or each time any SunTrust account is accessed for any purpose within the United States, including to make an inquiry of available funds or to access other account information, the inquiry and the response are routed via computer between the location where the account is accessed and the main frame computer terminal in Atlanta, Georgia.

5. During the months of June and July 2006, defendant **KOUMBAIRIA** caused Individual D to compromise the accounts of 15 SunTrust business clients by accessing the client account information, and/or providing defendant **KOUMBAIRIA** with a copy of a legitimate check drawn on each client's account, enabling defendant **KOUMBAIRIA** to produce counterfeit checks to be drawn and passed on each client's account. In total, 76 counterfeit checks were passed and drawn on the accounts of SunTrust customers in the Washington, D.C. area, resulting in a loss of $99,210.38 to SunTrust Bank and other retail establishments.

6. As part of the scheme and artifice, defendant **KOUMBAIRIA** met with Individual D in the District of Columbia to retrieve copies of the checks and/or information on the accounts of SunTrust customers. At those times, defendant **KOUMBAIRIA** asked Individual D to check the accounts on SunTrust's computer system to ascertain the number of next check. Defendant **KOUMBAIRIA** also caused Individual D to determine how much money was in the account, so he would know for how much he could make the counterfeit check.

19

7.  As a direct result of his request in the District of Columbia, defendant **KOUMBAIRIA** caused Individual D to access the information on the compromised accounts from SunTrust's computer and to provide the information to defendant **KOUMBAIRIA,** who in turn made the counterfeit checks on his computer in his home in the District of Columbia.  Thereafter, either **KOUMBAIRIA, GLAY, TANTOH, JOHNSON,** and/or other persons both known and unknown to the Grand Jury, would give the counterfeit checks to passers to cash.

8.  On or about the dates listed below, for the purpose of executing and attempting to execute, and aiding and abetting the execution of the above-described scheme to defraud, defendant **KOUMBAIRIA,** while in the District of Columbia, did willfully cause unindicted Individual D to access SunTrust Bank's computer, and therefor cause to be transmitted in interstate commerce from the state of Maryland to the state of Georgia, by means of a wire communication, certain signs and signals, that is, computer inquiries of bank account information for the below-listed SunTrust bank accounts:

| Date Account Accessed | Name of Business Account | Number of Checks | Loss Amount |
|---|---|---|---|
| 6/6/06 (3 times) | Focused Management Inc. | 5 | $12,472.00 |
| 6/19/06 (5 times) | D & D Tire Company | 5 | $5,978.03 |
| 6/29/06 (2 times) | St. Thomas More Dialysis Center | 10 | $9,959.00 |
| 7/1/06 (3 times) | Luna Concrete | 3 | $4,484.55 |
| 7/6/06 (3 times) | Pioneer Builders, Inc. | 4 | $5,982.97 |
| 7/7/06 (7 times) | Phenix Solution | 4 | $5,633.02 |
| 6/29/06 (3 times) | Conway Corporation | 2 | $2,987.42 |
| 6/29/06 (3 times) | JA Construction Company | 2 | $2, 984.80 |
| 6/28/06 (7 times) | NNA, Incorporated | 9 | $12,955.00 |

| 6/17/06 (1 time) | Ortiz Construction Company | 1 | $1,491.00 |
| 6/29/06 (8 times) | Quality Elevator Company | 3 | $4,489.62 |
| 7/7/06 (1 time) | Rand Construction Company | 8 | $10,974.77 |
| 7/6/06 (2 times) | Rockingham Construction Company | 3 | $2,882.60 |
| 7/7/06 (3 times) | Town of Bladensburg | 2 | $2,993.40 |
| 6/21/06 (9 times) | Freedom Restoration | 13 | $12,942.20 |

**(Wire Fraud, Aiding and Abetting, Causing an Act to be Done,
in violation of Title 18, United States Code, Sections 1343, 2)**

### COUNT THREE - BANK FRAUD

### Bank of America

1.  Paragraphs one through seventeen and twenty through sixty-two of Count One of this Indictment contain the description of the following scheme and are re-alleged and incorporated by reference as if set out in full.

2.  From in or about January 2006, through in or about December 2006, within the District of Columbia and elsewhere, **KOUMBAIRIA, GLAY, TANTOH, JOHNSON, YOKLEY,** and others both known and unknown to the Grand Jury, executed and intended to execute a scheme or artifice, or attempted to execute a scheme or artifice, and aided and abetted the execution of the scheme or artifice, or the attempt to execute the scheme or artifice to defraud Bank of America, a financial institution, in order to obtain money owned by and under the custody and control of Bank of America by means of false and fraudulent pretenses, representations, and promises.

3.  At all times material to this indictment, Bank of America was a financial institution whose assets were insured by the Federal Deposit Insurance Corporation.

4.  The main frame computer terminal for Bank of America is located at 100 North Tryon Street, Bank of America Corporate Center, Charlotte, North Carolina.

21

5.  Each time a check is cashed on an account at any Bank of America branch throughout the United States, or each time any Bank of America account is accessed for any purpose throughout the United States, including to make an inquiry of available funds or to access other account information, the inquiry and the response is routed via computer between the location where the account is accessed, including in the District of Columbia, and the main frame computer terminal in Charlotte, North Carolina.

6. **KOUMBAIRIA, GLAY, TANTOH, JOHNSON,  YOKLEY,** and/or others both known and unknown to the Grand Jury, for the purpose of executing, and attempting to execute and aiding and abetting the execution of the above-described scheme, either cashed or attempted to cash, or caused each of the following checks to be cashed or attempted to be cashed  in the District of Columbia, or they caused the checks to be stolen, and either counterfeited them, or caused them to be counterfeited in the District of Columbia.  The total loss amount associated with counterfeit checks drawn on the accounts of customers of  the Bank of America was $392,351:

| Payor | Date of Check | Payee | Amount |
|-------|---------------|-------|--------|
| Citrix Online LLC | 2/17/06 | Terence Ward | $48,956.00 |
| Fasone Garrett Boehm | 3/3/06 | Otis Brady | $1,471.56 $1,495.20 |
| Fasone Garrett Boehm | 3/3/06 | Charles Butler | $1,493.50 |
| Fasone Garrett Boehm | 3/3/06 | Shanelle Sims | $1,497.15 $1,493.52 |
| Fasone Garrett Boehm | 3/3/06 | Corvette Randolph | $1,491.10 $1,497.32 |
| Fasone Garrett Boehm | 3/3/06 | Otis Brady | $1,498.22 |

| Fasone Garrett Boehm | 3/3/06 | Almeta Calloway | $1,479.23 $1,481.17 |
| Fasone Garrett Boehm | 3/3/06 | Shamika Balogun | $1,281.17 $1,381.17 |
| Fasone Garrett Boehm | 3/3/06 | **KENYA YOKLEY** | $993.12 $995.12 $997.16 $992.04 |
| Fasone Garrett Boehm | 3/3/06 | Tagman Mohamed | $991.07 $993.07 $993.17 $993.12 |
| Fasone Garrett Boehm | 3/3/06 | Eyob Fetene | $4,997.42 |
| Got-V-Mail | 9/8/06 | Daniel Santiago | $1,491.00 $1,492.00 |
| Hotel Lombardy | 2/12/06 | George Washington | $87,400.00 |
| Hotel Lombardy | 3/10/06 | Fithawi Amdemicheal | $46,562.75 |
| Hotel Lombardy | 3/14/06 | Kevin Gross | $52,610.00 |
| Howard University | | Jamaal Marcelle | $995.22 |
| Howard University | 2/2/06 | Helena Chappell | $1,491.75 |
| Howard University | 2/2/06 | Julian Valero, Jr. | $1,492.35 |
| Howard University | 2/2/06 | Edward Davis-Bey | $695.25 |
| Howard University | 2/2/06 1/10/06 | Angela Lancaster | $1,496.15 $1,497.35 $1,284.50 |
| Howard University | 2/10/06 | Nazir Shid | $891.25 |
| Howard University | 2/10/06 | Marques Glascoe | $1,595.68 |
| Orbis Marketing | 6/24/06 | Henry Vasquez | $997.39 |
| Orbis Marketing | 7/24/06 | Norweena Thomas | $991.25 |
| Orbis Marketing | 8/21/06 | Tagman Mohamed | $1,494.10 |
| Rainmakers International | 9/15/06 | Jermaine Tolover | $2,496.00 $2,492.00 |

| Safe Guard Pest Control | 2/24/06 | Saiydah Hipps | $492.75 |
|---|---|---|---|
| Safe Guard Pest Control | 2/24/06 | Lisa Jones | $792.75 |
| Select Comfort Retail | 8/21/06 | Tagman Mohamed | $1,496.07 |
| St. Louis Regional Chamber & Growth (RCGA) | 7/24/06 7/26/06 | Eyob Fetene | $997.16 $995.00 |
| St. Louis Regional Chamber & Growth (RCGA) | 7/26/06 | Tagman Mohamed | $997.00 |
| State Plaza Hotel | 1/23/06 | Terence Ward | $47,357.14 |
| State Plaza Hotel | 2/10/06 | Jamaal Marcelle | $995.50 |
| State Plaza Hotel | 2/10/06 | Angela Lancaster | $1,284.50 |
| Superfriends Marketing & Promotion Group | 3/6/06 | Shanelle Simms | $1,492.70 $1,495.30 |
| Superfriends Marketing & Promotion Group | 3/6/06 | Wanda Howell (no copy of check) | $1,493.71 |
| Tech Support Services | 3/24/06 | Patrice Dupree | $998.32 |
| Tech Support Services | 3/24/06 | Robert Dancy | $995.25 |
| The Arc of Montgomery County, Inc. | 12/20/06 | Jose Suncar | $1,492.00 |
| The Arc of Montgomery County, Inc. | 12/20/06 | Darnita McPhail | $1,493.00 |
| The Arc of Montgomery County, Inc. | 12/20/06 | Barbara Beasley | $1,497.00 $1,476.00 |
| The Arc of Montgomery County, Inc. | 12/20/06 | Terence Bethea | $2,497.00 $2,491.00 $2,497.00 $2,495.00 $2,495.00 |
| The Arc of Montgomery County, Inc. | 12/20/06 | Shanay Teeter | $1,493.00 |
| The Arc of Montgomery County, Inc. | 12/20/06 | Phillip Clark | $1,494.00 $1,495.00 $2,493.00 |

24

| The Arc of Montgomery County, Inc. | 12/20/06 | Daniyom Tesfaye | $2,495.00 $2,497.00 |
| Vador Ventures | 5/5/06 | Lisa Gray (No copy of check but cashed in D.C.) | $1,495.35 $1492.75 |
| Vador Ventures | 5/5/06 | Gilbert Spence | $1,494.05 $1,496.07 |
| Vador Ventures | 5/5/06 | Phillip Green | $1,485.91 $1,497.43 |
| Vador Ventures | 5/5/06 | Richol Griner | $1,491.20 |
| Vador Ventures | 5/5/06 | Katia Mayberry | $1,492.50 |
| Vador Ventures | 5/5/06 | Darryl McCoy | $692.35 |

**(Bank Fraud, Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1344, 2)**

## COUNT FOUR - BANK FRAUD

### Wachovia Bank

1. Paragraphs one through seventeen and twenty through sixty-two of Count One of this Indictment contain the description of the following scheme and are re-alleged and incorporated by reference as if set out in full.

2. From in or about July 2004, through in or about November 2006, within the District of Columbia and elsewhere, **KOUMBAIRIA**, **GLAY, TANTOH, JOHNSON, YOKLEY,** and others both known and unknown to the Grand Jury, executed and intended to execute a scheme or artifice, or attempted to execute a scheme or artifice, and aided and abetted the execution of the scheme or artifice, or the attempt to execute the scheme or artifice to defraud Wachovia Bank, a financial institution in order to obtain money owned by and under the custody and control of Wachovia Bank by means of false and fraudulent pretenses, representations and promises.

3.  At all times material to this indictment, Wachovia Bank was a financial institution whose assets were insured by the Federal Deposit Insurance Corporation.

4.  The main frame computer terminal for Wachovia Bank is located at 1524 West W.T. Harris Boulevard, Charlotte, North Carolina.

5.  Each time a check is cashed on an account at any Wachovia Bank branch within the United States, or each time any Wachovia Bank account is accessed for any purpose throughout the United States, including to make an inquiry of available funds or to access other account information,  the inquiry and the response is routed via computer between the location where the account is accessed, including in the District of Columbia, and the main frame computer terminal in Charlotte, North Carolina.

6. Each of the following checks were cashed or  attempted to be cashed in the District of Columbia.  They were cashed or attempted to be cashed or were caused to be cashed or attempted to be cashed by, **KOUMBAIRIA**, **GLAY, TANTOH, JOHNSON, YOKLEY,** and others both known and unknown to the Grand Jury, for the purpose of executing, and attempting to execute, and aiding and abetting the execution of the above-described scheme.  The total loss amount associated with counterfeit checks drawn on the accounts of customers of the Wachovia Bank was $126,321.15:

| Payor | Date of Check | Payee | Amount |
|---|---|---|---|
| Access Worldwide | 12/5/05 | Carl Lee | $695.15<br>$795.15<br>$895.15 |
| Access Worldwide | 12/5/05<br><br>12/16/05 | Nasir Shid | $690.75<br>$490.75<br>$775.25 |

| Access Worldwide | 12/9/05 | Charles Carter | $791.41 |
|---|---|---|---|
| Access Worldwide | 12/5/05 | William R.Cobb | $672.95<br>$772.95 |
| Access Worldwide | 12/5/05<br>12/9/05 | Lyndell Fribbley | $891.42<br>$894.61<br>$894.61 |
| Access Worldwide | 12/9/05 | Angela J. Lancaster | $896.03 |
| Access Worldwide | 12/9/05 | Veronica Walker | $872.15 |
| Access Worldwide | 12/9/05 | Fitsum Berhane | $798.45<br>$898.45 |
| Access Worldwide | 12/9/05 | Edward Davis-Bey | $895.10<br>$898.07<br>$898.07 |
| Access Worldwide | 12/9/05 | Kevin Walker | $894.35 |
| Access Worldwide | 12/9/05 | Henry Reed Anderson, Jr. | $891.75 |
| Access Worldwide | 12/9/05 | Darryl Byers | $893.41 |
| Access Worldwide | 12/9/05 | Nimha Burrow | $845.69 |
| Best Western Falls Church Inn | 4/27/06 | Gilbert M. Spence | $1,493.25 |
| Best Western Falls Church Inn | 4/27/06 | Phillip D. Green | $1,492.45<br>$1,495.15 |
| Fort Myer Construction Corp | 7/6/06 | Percival Pendergrass | $4,729.73<br>$2,759.53 |
| Fort Myer Construction Corp | 7/6/06 | Shaka Lee | $2,479.23<br>$2,649.73 |
| Home Depot | 11/22/06<br>8/16/06<br>10/21/06<br>10/28/06<br>10/18/06 | Nasir Shid<br>Nasir Shid<br>Nazir Shid<br>Nazir Shid<br>Nazir Shid | $446.82<br>$446.82<br>$479.52<br>$789.52<br>$485.56 |
| Home Depot | 10/20/05<br>10/28/05 | Edward D. Bey<br>Edward Davis-Bey<br>Edward D. Bey | $496.31<br>$698.61<br>$797.06<br>$697.06 |

| Home Depot | 10/28/05 | Elicia Trumpler | $992.13 |
|---|---|---|---|
| Home Depot | 10/28/05 | Cassandra L. Cunningham | $691.57 |
| Montgomery College | 5/9/04<br>6/15/04 | Adetunji Arojojoye | $9,850.25<br>$5,500.00 |
| Montgomery College | 11/5/04<br><br>11/10/04 | Veronica L. Wilson | $4,496.75<br>$4,491.81<br>$4,496.75<br>$4,496.75 |
| Montgomery College | 11/10/04 | Memunatu NH Jailoh | $4,491.81 |
| Montgomery College | 11/11/04 | Shantelle Braxton | $4,495.75<br>$4,495.75 |
| Montgomery College | 11/?/04<br>11/11/04 | Dishon Anderson | $4,495.75<br>$4,495.75<br>$4,495.75 |
| Pathways to Housing | 6/1/06<br><br>7/3/06 | Tyrone Hines | $596.00<br>$591.00<br>$898.00<br>$894.00 |
| Pathways to Housing | 7/3/06 | **KENYA T. YOKLEY** | $992.00<br>$996.00 |
| Pathways to Housing | 6/1/06<br>7/3/06 | Tagman A. Mohamed | $992.00<br>$995.00 |
| Pathways to Housing | 7/3/06 | Eyob D. Fetene | $997.00<br>$998.00 |
| Quality Build Maintenance | 12/3/05 | Isidorio Alexander Rubio | $2,494.52<br>$1,494.52 |
| Quality Build Maintenance | 12/30/05 | Kenneth Sloan | $2,495.27 |
| Quality Build Maintenance | 12/30/05 | Antwan Tyron Terry | $2,399.12 |
| Team Washington, Inc.<br>Domino's Pizza | 3/31/06<br>4/4/06 | James Michael Tate | $427.61<br>$427.61 |
| Team Washington, Inc.<br>Domino's Pizza | 4/10/06 | Lawrence McEachin | $486.32 |
| Team Washington, Inc.<br>Domino's Pizza | 1/21/05 | Jacqualine West | $496.00 |

28

| Tierco Maryland | 11/16/05 | Tommie Austin | $795.47 |
| Wahid Inc. T/A Portables | 1/11/06 | Veronica D. Walker | $2,491.12 |

**(Bank Fraud, Aiding and Abetting, Causing an Act to be Done,**
**in violation of Title 18, United States Code, Sections 1344, 2)**

## COUNTS FIVE THROUGH FOURTEEN - UTTERING THE SECURITIES OF A PRIVATE ENTITY

1.  Paragraphs one through seventeen and twenty through sixty-two of Count One of this Indictment contain the description of the following scheme and are re-alleged and incorporated by reference as if set out in full.

2.  In or about March 2006, within the District of Columbia, defendants **KOUMBAIRIA**, **YOKLEY,** and others both known and unknown to the Grand Jury, did knowingly make, utter and possess, counterfeited securities of Fasone Garrett Boehm, a Kansas-based advertising organization, with the intent to deceive Fasone Garrett Boehm.

3.  In or about July 2006, within the District of Columbia, defendants **KOUMBAIRIA**, **YOKLEY,** and others both known and unknown to the Grand Jury, did knowingly make, utter and possess, counterfeited securities of Pathways to Housing, Inc., an organization to assist homeless people to obtain housing, with the intent to deceive Pathways to Housing.

4.  In or about June 2006, within the District of Columbia, defendants **KOUMBAIRIA**, **YOKLEY,** and others both known and unknown to the Grand Jury, did knowingly make, utter and possess, counterfeited securities of Freedom Restoration, a faith-based, Christ-centered organization dedicated to helping families plagued by drug and alcohol addiction and abuse, with the intent to deceive Freedom Restoration.

29

5. In or about June 2006, within the District of Columbia, defendants **KOUMBAIRIA**, **YOKLEY,** and others both known and unknown to the Grand Jury, did knowingly make, utter and possess, counterfeited securities of NNA, Inc., a Maryland-based defense contracting firm, with the intent to deceive NNA, Inc.

6. In or about July 2006, within the District of Columbia, defendants **KOUMBAIRIA**, **YOKLEY,** and others both known and unknown to the Grand Jury, did knowingly make, utter and possess, counterfeited securities of St. Thomas Moore Dialysis Center, LLC a Maryland-based dialysis center, with the intent to deceive St. Thomas Moore Dialysis Center, LLC.

7. On or about the dates listed below, in the District of Columbia, defendants **KOUMBAIRIA**, **YOKLEY**, and others both known and unknown to the Grand Jury, cashed and caused to be cashed the following checks of the aforementioned organizations, totaling $10,454.05, within the District of Columbia:

| COUNT | DATE | PAYOR | PAYEE | AMOUNT |
|-------|------|-------|-------|--------|
| **FIVE** | 3/3/06 | Fasone Garrett Boehm | **KENYA N. YOKLEY** | $993.12 |
| **SIX** | 3/3/06 | Fasone Garrett Boehm | **KENYA N. YOKLEY** | $995.12 |
| **SEVEN** | 3/3/06 | Fasone Garrett Boehm | **KENYA N. YOKLEY** | $997.16 |
| **EIGHT** | 3/3/06 | Fasone Garrett Boehm | **KENYA N. YOKLEY** | $992.04 |
| **NINE** | 7/3/06 | Pathways to Housing, Inc. | **KENYA N. YOKLEY** | $992.00 |

| TEN | 7/3/06 | Pathways to Housing, Inc. | **KENYA N. YOKLEY** | $996.00 |
|---|---|---|---|---|
| **ELEVEN** | 6/20/06 | Freedom Restoration | **KENYA N. YOKLEY** | $998.51 |
| **TWELVE** | 6/27/06 | NNA, Inc. | **KENYA N. YOKLEY** | $1,494.00 |
| **THIRTEEN** | 7/14/06 | St. Thomas More Dialysis Center, LLC | **KENYA N. YOKLEY** | $998.05 |
| **FOURTEEN** | 7/14/06 | St. Thomas More Dialysis Center, LLC | **KENYA N. YOKLEY** | $998.05 |

**(Uttering the Securities of a Private Entity and Causing an Act to Be Done, in violation of Title 18, United States Code, Sections 513 and 2)**

## COUNTS FIFTEEN AND SIXTEEN - UTTERING THE SECURITIES OF A PRIVATE ENTITY

1.   Paragraphs one through seventeen and twenty through sixty-two of Count One of this Indictment contain the description of the following scheme and are re-alleged and incorporated by reference as if set out in full.

2.   From in or about Janurary 2006, within the District of Columbia and elsewhere, defendants **KOUMBAIRIA**, **TANTOH**, Individual C, Individual I, Individual H, and others both known and unknown to the Grand Jury, did knowingly make, utter, and/or possess, counterfeited securities of State Plaza Hotel, a Washington, D.C.-based, all-suite hotel organization, with the intent to deceive State Plaza Hotel.

3.   From in or about February 2006, within the District of Columbia and elsewhere, defendants **KOUMBAIRIA**, **TANTOH**, Individual C, Individual I, Individual H, and others both known and unknown to the Grand Jury, did knowingly make, utter, and/or possess, counterfeited

securities of Citrix Online LLC, a Santa Barbara-based web organization, with the intent to deceive Citrix Online LLC.

4.  On or about the dates listed below, in the District of Columbia and elsewhere, defendants **KOUMBAIRIA**, **TANTOH**, Individual C, Individual I, Individual H, and others both known and unknown to the Grand Jury, possessed, counterfeited and caused to be cashed, the checks of the aforementioned organizations, totaling $96,313.14, within the District of Columbia:

| COUNT | DATE | PAYOR | PAYEE | AMOUNT |
|-------|------|-------|-------|--------|
| **FIFTEEN** | 1/23/06 | State Plaza Hotel | Individual C | $47,357.14 |
| **SIXTEEN** | 2/17/06 | Citrix Online LLC | Individual C | $48,956.00 |

**(Uttering the Securities of a Private Entity and Causing an Act to Be Done, in violation of Title 18, United States Code, Sections 513 and 2)**

## FORFEITURE ALLEGATIONS

**Forfeiture as to Count One**:

1.  Paragraphs one through sixty-two of Count One are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 28, United States Code, Section 2461(c) (incorporating Title 18, United States Code, Section 981(a)(1)(C)).

2.  As a result of the offense alleged in Count One of this Indictment, defendants **KOUMBAIRIA**, **GLAY, TANTOH, JOHNSON, COLEMAN** and **YOKLEY** shall forfeit to the United States any and all property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of the Conspiracy to commit Bank Fraud and Wire Fraud, in violation of Title 18, United States Code, Section 1349.  Such property includes, but is not limited to:  **Money Judgment:  $1,600,000**, for which each defendant is jointly and severally liable, which

judgment represents a sum of money equal to an amount of proceeds, obtained directly or indirectly, from the conspiracy to commit bank and wire fraud, in violation of Title 18, United States Code, Section 1349.

3.    By virtue of the commission of the felony offense charged in Count One of this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to Title 28, United States Code, Section 2461(c).  If any of the property described above as being subject to forfeiture, as a result of any act or omission of a defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of a defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 28, United States Code, Section 2461(c)
(incorporating Title 18, United States Code, Section 981(a)(1)(C)).)**

**Forfeiture as to Count Two**:

1.  Paragraphs one through eight of Count Two are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(2).

2.  As a result of the offense alleged in Count Two of this Indictment, defendants **KOUMBAIRIA, GLAY, TANTOH,** and **JOHNSON** shall forfeit to the United States any and all property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of their scheme to commit Wire Fraud, in violation of Title 18, United States Code, Section 1343.  Such property includes, but is not limited to:  **Money Judgment:  $99,210.38**, for which each defendant is jointly and severally liable, which judgment represents a sum of money equal to an amount of proceeds, obtained directly or indirectly, from the scheme to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

3.  By virtue of the commission of the felony offense charged in Count Two of this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(2).  If any of the property described above as being subject to forfeiture, as a result of any act or omission of a defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of a defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(2).)**

**Forfeiture as to Count Three:**

1. Paragraphs one through six of Count Three are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(2).

2. As a result of the offense alleged in Count Three of this Indictment, defendants **KOUMBAIRIA, GLAY, TANTOH, JOHNSON, COLEMAN** and **YOKLEY** shall forfeit to Citrix Online LLC, a Santa Barbara-based web organization, any and all property, real or personal, constituting, or derived from proceeds, obtained directly or indirectly, as the result of their scheme to commit Bank Fraud, in violation of Title 18, United States Code, Section 1344. Such property includes, but is not limited to: **Money Judgment: $392,351**, for which each defendant is jointly and severally liable, which judgment represents a sum of money equal to an amount of proceeds, obtained directly or indirectly, from the scheme to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

3. By virtue of the commission of the felony offense charged in Count Three of this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(2). If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

35

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(2).)**

**Forfeiture as to Count Four:**

1.  Paragraphs one through six of Count Four are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(2).

2.  As a result of the offense alleged in Count Four of this Indictment, defendants **KOUMBAIRIA**, **GLAY, TANTOH, JOHNSON,** and **YOKLEY** shall forfeit to the United States any and all property, real or personal, constituting, or derived from proceeds, obtained directly or indirectly, as the result of their scheme to commit Bank Fraud, in violation of Title 18, United States Code, Section 1344.  Such property includes, but is not limited to: **Money Judgment: $126,321.15**, for which each defendant is jointly and severally liable, which judgment represents a sum of money equal to an amount of proceeds, obtained directly or indirectly, from the scheme to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

3.   By virtue of the commission of the felony offense charged in Count Four of this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(2).  If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(2).)**

A TRUE BILL


FOREPERSON




ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA